## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:

JACOB SCHUR,

     Plaintiff,

v.

TOWN OF BASALT, COLORADO,
AARON MUNCH,
VALERIA MORALES, and
NINO SANTIAGO,

     Defendants.

---

## COMPLAINT AND JURY DEMAND

---

     Plaintiff, Jacob Schur, by and through his attorneys of the Civil Rights Litigation Group, LLP, hereby submits this Complaint and Jury Demand, and alleges as follows:

### <u>INTRODUCTION</u>

     This is a civil rights case involving three unlawful arrests of Jacob Schur by Basalt Police Officers, for non-threatening and disability-related communications that cannot be reasonably construed as criminal conduct. Mr. Schur is a Colorado resident, attorney, business owner, and father of two. He has also been diagnosed with severe obsessive-compulsive disorder ("OCD"), which he has lived with for many years. Within one year, Lieutenant Aaron Munch of the Basalt Police Department arrested Mr. Schur without a warrant or probable cause, first, on December 30, 2022, and, a second time, on November 10, 2023. Defendant Munch charged Mr. Schur with felony trespassing for entering his own house, harassment for non-threatening texts to his wife about their

children and home life, and domestic violence where there was none. All of these charges lacked probable cause. Less than one year after the second arrest, Defendants Morales and Santiago arrested Mr. Schur a third time, charging him with felony trespassing for entering his own home, harassment for exchanging non-threatening texts to his wife, and domestic violence. These charges were similarly meritless and appeared to follow the same subjective logic as the first two: the officers thought Mr. Schur's disability-related communications about cleanliness were "over the top" and sought to keep Mr. Schur from his own property and his wife. As a result of these unfounded charges, Mr. Schur spent four nights in jail, including New Year's Eve of 2022.

It appears from the communications and actions of the defendant officers that they lacked knowledge of, or disregarded, critical information about the state of the law at the time charges were asserted. Thus, in addition to the defendant officers' unreasonable conduct, Defendant Town of Basalt was a moving force behind Mr. Schur's arrests by (1) failing to train and supervise its officers to avoid misperceiving disability-related conduct as criminal conduct, (2) permitting its officers to make arrests under an invalidated provision of the harassment statute, and (3) permitting its officers to make arrests and seek arrest warrants without establishing probable cause for each element of the crime. The Town's failure to train/supervise its officers proximately caused all three of Mr. Schur's arrests, and the continuing pattern of arrests evidence an unconstitutional practice that must be stopped.

Due to these repeated arrests without probable cause, Mr. Schur is reasonably afraid that the pattern will continue, and that officers will return and arrest him in the future for his disability-related communications or for merely returning to his own property or contacting his wife. As a result, Mr. Schur seeks intervention from the court in the form of declaratory and/or injunctive relief to ensure that the department and its officers refrain from making unlawful arrests, are properly trained to execute the law as required, and to respect his disability-related rights. Mr. Schur seeks compensation

for mental and emotional harm, lost liberty, and economic injuries that the officers have caused and continue to cause him to this day. He also seeks the imposition of punitive damages against the individual officers to punish and deter the blatant abuse of authority and violation of Mr. Schur's constitutional and legal rights.

## JURISDICTION AND VENUE

1.      Plaintiff's federal claims are brought pursuant to 42 U.S.C. §1983 and the Constitution of the United States.

2.      Plaintiff's state law claims are brought pursuant to C.R.S. § 13-21-131 and the Colorado Constitution.

3.      This Court has subject matter jurisdiction of the federal claims pursuant to 28 U.S.C. §1331.

4.      This Court has supplemental subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) because all the events alleged herein occurred in the State of Colorado.

6.      Jurisdiction supporting Plaintiff's claim for attorney's fees and costs is conferred by 42 U.S.C. §1988 and C.R.S. § 13-21-131(3).

## PARTIES

7.      Plaintiff Jacob Schur was at all times relevant to the claims set forth herein a resident of the State of Colorado.

8.      Defendant Town of Basalt is a Colorado municipality, established under the laws of Colorado. Defendant Town of Basalt is responsible for the policies, practices, training, supervision,

and final decision-making of the Basalt Police Department and its officers. Defendant Town of Basalt was, at all times relevant to the subject matter of this Complaint, the employer of Defendant Munch.

9.      Defendant Aaron Munch was, at all times relevant to the claims in this action, employed as a police officer by the Basalt Police Department, and acted under color of state law. He is identified in his individual capacity.

10.      Defendant Valeria Morales was, at all times relevant to the claims in this action, employed as a police officer by the Basalt Police Department, and acted under color of state law. She is identified in her individual capacity.

11.      Defendant Nino Santiago was, at all times relevant to the claims in this action, employed as a police officer by the Basalt Police Department, and acted under color of state law. He is identified in his individual capacity.

## FACTUAL ALLEGATIONS

12.      Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

13.      Mr. Schur and his wife, Kerrie Schur, were married in 2013.

14.      They have two children together, which were four years old and one year old in November 2022.

15.      Mr. Schur has been diagnosed with a severe form of obsessive-compulsive disorder ("OCD"), which is triggered when he is confronted with perceived contamination in his home and motivated by a strong instinct to protect his family from harm.

16.      Mr. Schur lived with his wife and kids at 100 Evans R #104, Basalt, Colorado, since 2020.

17.      Mr. Schur owned the home and is the only person named on the title to the property.

18.     A prenuptial agreement between Mr. Schur and Kerrie Schur identified the home as Mr. Schur's property.

19.     At the beginning of December 2022, Mr. Schur decided to stay at another apartment in order to provide he and his family some space and some relief from his OCD triggers at home.

20.     Some nights he would stay at the apartment, and other nights he would stay at the home.

21.     At this time, Mr. Schur and his wife were not divorced or legally separated. It was a voluntary decision by Mr. Schur to accommodate his disability and help reduce anxiety and tension in the home.

22.     Mr. Schur continued to regularly see his children and visit the home, including a family gathering at the home on Christmas Eve and Christmas Day of 2022.

### First Arrest - December 30, 2022

23.     On December 30, 2022, Lieutenant Munch was dispatched to Mr. Schur's home after Mr. Schur's wife called the police.

24.     When Defendant Munch arrived, Mrs. Schur immediately explained to him that Mr. Schur had a diagnosed mental health condition: OCD. She further explained to Defendant Munch that when Mr. Schur comes to the house his OCD gets triggered and leads to tension.

25.     Mrs. Schur explained that she and Mr. Schur were taking a voluntary and temporary break in their relationship, and that Mr. Schur had recently started staying at a nearby apartment some nights.

26.     Mrs. Schur told Defendant Munch, "There's no restraining order."

27.     Mrs. Schur confirmed with Defendant Munch that Mr. Schur still had a key to the home.

28.     As the property owner, Mr. Schur continued to have a property interest in the Evans Road home and remained responsible for maintenance, bills, etc.

29.     Mrs. Schur complained to Defendant Munch that Mr. Schur's OCD would get "triggered" when his home was disorganized or dirty.

30.     Mrs. Schur explained that when Mr. Schur's OCD was triggered, he would verbally complain. For example, Mrs. Schur told Defendant Munch that Mr. Schur was triggered by the fact that the children's Christmas gifts were not washed before being gift wrapped. In response, Mr. Schur unwrapped the gifts, washed them, and re-wrapped them. Nobody was threatened or harmed during this process of washing and re-wrapping gifts.

31.     Mrs. Schur told Defendant Munch multiple times that Mr. Schur had never hurt her or gotten physical with her. She specifically told Defendant Munch, "There hasn't been any physical abuse." Instead, Mrs. Schur repeatedly explained that when Mr. Schur's OCD gets triggered things get "really tense" and "it's a lot."

32.     When Defendant Munch asked what kind of things Mr. Schur was saying, Mrs. Schur began looking at texts from her cell phone. She showed Defendant Munch a few messages from Mr. Schur where he asked why luggage from a recent trip was still in the hallway. Mrs. Schur struggled while looking through the texts to find any examples of something harassing. After looking through her cell phone for several minutes, Mrs. Schur could not identify any examples of harassing or threatening messages, which she conveyed to Defendant Munch.

33.     Mrs. Schur told Defendant Munch about a list of "protocols" regarding Mr. Schur's preferences for cleanliness. Mrs. Schur showed the list to Defendant Munch and sent it to him. Defendant Munch asked, "What's the basis for that [list]? I don't understand." In response, Mrs. Schur

said, "OCD – basically it is these protocols for how he wants things done." The list included "protocols" for handling garbage, laundry, and cleaning – the "triggers" for Mr. Schur's OCD.

34.    Mrs. Schur continued looking at texts on her cell phone for several more minutes, but she could not identify any harassing or threatening texts. All of the texts related to their children or issues related to cleanliness.

35.    As Mrs. Schur was scrolling through her text messages, she reached the texts from that day, December 30, 2022. She explained that Mr. Schur had arrived at the house earlier that day while she was on an errand.

36.    Mr. Schur went to the house on December 30, 2022, because Mrs. Schur informed him that she could not find the key to the storage unit. Mr. Schur informed Mrs. Schur that the key was in the kitchen. Mrs. Schur grew frustrated when she could not find it.  She thus asked Mr. Schur if he could find the key.  Mr. Schur went to the house to find the key, and he sent Mrs. Schur a picture of the key sitting in a drawer.

37.    When Mrs. Schur returned home and found Mr. Schur there, she told him to leave and pushed him out of the house. Mrs. Schur confirmed with Defendant Munch that she pushed Mr. Schur out of the house. In response, Defendant Munch said, "That's fine. He was telling the other officer that you hit him in the shoulder."

38.    After less than twenty minutes of talking with Mrs. Schur, and with only the information described above, Defendant Munch told Mrs. Schur that Mr. Schur was going to jail for domestic related charges. Defendant Munch stated that what Mrs. Schur said and showed him was "way over the top." Defendant Munch said Mr. Schur's arrest "definitely needed to happen."

39.     During the time when Defendant Munch was interviewing Mrs. Schur, other officers had initiated a traffic stop of Mr. Schur at Defendant Munch's request. Mr. Schur remained detained at the traffic stop during Defendant Munch's interview of Mrs. Schur.

40.     Defendant Munch instructed the officers detaining Mr. Schur to arrest Mr. Schur for felony trespassing, harassment, and domestic violence. Defendant Munch confirmed with the arresting officer that Mrs. Schur admitted to pushing Mr. Schur out of the house.

41.     Defendant Munch told the other officers, "This is the reason DV laws are in place."

42.     At the time of Mr. Schur's arrest, felony trespassing occurred when a person "knowingly and unlawfully enter[ed] or remain[ed] in a dwelling of another" and "the dwelling is inhabited or occupied." C.R.S. § 18-4-502.

43.     At the time of Mr. Schur's arrest, harassment under subsection (1)(e) required communications made "in a manner intended to threaten bodily injury or property damage … [or] that is obscene." C.R.S. § 18-9-111(1)(e); *see also People v. Moreno*, 506 P.3d 849, 856 n.5 (Colo. 2022) (striking phrase "harass or" from subsection (1)(e)).

44.     Mr. Schur spent two nights in jail as a result of this arrest, including New Year's Eve of 2022.

45.     The charges were dismissed soon thereafter.

**_Second Arrest - November 10, 2023_**

46.     Less than one year later, on November 10, 2023, Defendant Munch responded to a call from Linda Martin (Mrs. Schur's mother), who stated that Mr. Schur was harassing Mrs. Schur.

47.     Defendant Munch called Mrs. Schur to get more information. When asked about the harassing messages, Mrs. Schur described an incident where Mr. Schur wanted to be involved with the parent-teacher conference. Mrs. Schur explained that she did not want Mr. Schur to be present during

her parent-teacher conference involving their children, and she felt that Mr. Schur's insistence on being present was "insulting" and "harassing."

48.    Mrs. Schur described an incident from the prior night as "intense." During this incident, Mr. Schur calmy insisted that his daughter's hat needed to be washed before she wore it again because it fell on the wet, dirty floor of a public bathroom, and Mrs. Schur interpreted this as harassing and insulting.

49.    Mrs. Schur also read text messages from Mr. Schur where he explained that he would pick up their children from school that evening.

50.    These were the only incidents Mrs. Schur described to Defendant Munch.

51.    Mrs. Schur confirmed with Defendant Munch that Mr. Schur had not been violent and had not threatened her with physical harm; she merely reiterated over and over that the above-mentioned text messages were "harassing" and "insulting." When directly asked by Defendant Munch, Mrs. Schur confirmed that she had no reason to believe Mr. Schur would cause physical harm to her or their children.

52.    Throughout these text communications, Mrs. Schur regularly responded and continued the text conversation with Mr. Schur.

53.    At no point did Mrs. Schur attempt to block Mr. Schur's phone number or otherwise prevent him from contacting her, although she admitted to Defendant Munch that she could probably do that.

54.    Defendant Munch stated that Mr. Schur committed harassment because "30 text messages over the course of an evening sounds extreme." Defendant Munch did not have the text messages when he arrested Mr. Schur on November 10, 2023.

55.     When discussing the text messages with Mrs. Schur, Mrs. Schur admitted she was guessing as to the number of messages. Additionally, Mrs. Schur did not identify the time of day when she received the messages or indicate that the messages were sent at inconvenient or abnormal hours. Indeed, most of the messages were just truncated, in that Mr. Schur pressed enter after every text (as he always did) instead of writing a long text.

56.     Despite the absence of anything remotely approaching probable cause for harassment, Defendant Munch told Mrs. Schur, "What you're describing, it definitely fits the bill for harassment. My next plan is to track him down and have him arrested."

57.     Defendant Munch called Mr. Schur. During that phone call, Mr. Schur explained that his communications to Mrs. Schur were about his family. Mr. Schur explained that he was merely communicating safety concerns to his wife (i.e., contamination/health issues relating to his OCD triggers).

58.     Mr. Schur explained that his communications were a product of his OCD, and he reminded Defendant Munch to take his disability into consideration "from an ADA perspective."

59.     In response, Defendant Munch stated, "Unfortunately, [the ADA] doesn't fall under the criminal aspect with regards to the harassment statute."

60.     Defendant Munch confirmed with Mr. Schur that he and Mrs. Schur were providing the same information and that their stories matched.

61.     Defendant Munch insisted that Mr. Schur meet him outside so that he could arrest Mr. Schur for harassment.

62.     Although Mr. Schur had committed no crime, he agreed to meet with Defendant Munch in the parking lot of the high school so as to be cooperative.

63.     Defendant Munch told Mr. Schur that he was being charged with harassment because of the way his texts made Mrs. Schur feel. Defendant Munch could not identify anything about the messages that made them criminal.

64.     Defendant Munch put Mr. Schur in handcuffs and drove him to the jail approximately one hour away.

65.     During the drive to the jail, Mr. Schur asked Defendant Munch to describe the standard for determining when communications turned into harassment. In response, Defendant Munch stated, "How the victim feels is a big part of it." Beyond the victim's feelings, Defendant Munch could not articulate any standard justifying a harassment charge in circumstances without a threat.

66.     Defendant Munch could not articulate any reasonable or legally supportable foundation for the arrest or charges.

67.     Mr. Schur was released from jail the next day.

68.     At the probable cause hearing, the state court judge concluded there was no probable cause for the arrest.

### *Third Arrest - September 3, 2024*

69.     Less than one year after the second arrest, on July 27, 2024, Officer Valeria Morales responded to a call from Mrs. Schur complaining that Mr. Schur was trespassing at the home located on Evans Road.

70.     Mrs. Schur was in New Hampshire at the time, but she believed Mr. Schur was at the home.

71.     Except for Mr. Schur, the house was unoccupied while he was at the home on July 27, 2024.

72.    At this time, Mr. Schur remained the sole owner of the home.

73.    The prenuptial agreement confirmed that the home belonged to Mr. Schur and was not marital property.

74.    Defendant Morales requested a clearance check on Mr. Schur, which showed that there was no protection order and that Mr. Schur was allowed to be in his own home.

75.    Mr. Schur told Defendant Morales about a conversation he had with Defendant Munch a few days prior, wherein Defendant Munch told Mr. Schur that, without a protection order or other court order restraining him from the Evans Road home, Mr. Schur would not be trespassing. Defendant Morales called Defendant Munch and confirmed that this conversation took place.

76.    Defendant Morales called Defendant Sergeant Santiago to discuss the situation. Defendant Morales told Defendant Santiago that Mr. Schur was at the home cleaning and fixing appliances, and that Mrs. Schur was in New Hampshire at that time. Defendant Morales also conveyed to Defendant Santiago the conversation she had with Defendant Munch.

77.    Defendants Morales and Santiago knew that there were no legally binding orders preventing Mr. Schur from being present in his own home, and they verbally agreed with each other that the private agreement between Mr. and Mrs. Schur was not enforceable under criminal law.

78.    Defendant Santiago instructed Defendant Morales to "write it up" and submit a request for an arrest warrant for trespassing.

79.    Defendant Morales told Mr. Schur that she would be submitting a warrant request for trespassing.

80.    Mr. Schur asked Defendant Morales about the elements of trespassing, and she responded by saying that she did not know the elements off the top of her head – despite the fact that

she had just told him that she would be seeking a warrant for his arrest by asserting under oath that she had probable cause for trespassing.

81.    Defendant Morales told Mr. Schur not to text his wife anymore, and then left Mr. Schur's home to write and submit an arrest warrant for felony trespassing under C.R.S. § 18-4-502(1)(a).

82.    Defendants' only basis for asserting the trespassing charge was Mrs. Schur's subjective assertion that she did not want Mr. Schur at the home, and the assertion of a private agreement between Mr. and Mrs. Schur that allowed her and the children to live at the home while Mr. Schur stayed at a nearby apartment.

83.    Despite this private agreement, which was not enforceable through any court order, Mr. Schur remained the property owner and was responsible for maintaining and fixing the property, which Mrs. Schur refused to do.

84.    Additionally, at the time of all three arrests, Mr. Schur had rights to see his children.

85.    When drafting the warrant request, Defendant Morales decided to add a charge for harassment under C.R.S. § 18-9-111(h), which criminalizes repeated insults, taunts, challenges, or communications with offensively coarse language made to another person in a manner likely to provoke a violent or disorderly response (i.e., fighting words).

86.    Defendant Morales based the harassment charge only on the following text messages from Mr. Schur to Mrs. Schur:

- "Just know, I am over at the house. I am doing maintenance on it. Why is my iPad out? Did you go through any of my things?"
- "I called the police. I have a right to be here."
- "Please tell me what else is broken."

87.     Based on these communications, Defendant Morales sought an arrest warrant for harassment under C.R.S. § 18-9-111(1)(h) ("Repeatedly insults, taunts, challenges, or makes communications in offensively coarse language to another in a manner likely to provoke a violent or disorderly response").

88.     The arrest warrant also sought a domestic violence enhancer because Mr. Schur and Mrs. Schur were married at that time.

89.     On September 3, 2024, Defendant Morales submitted an affidavit seeking a warrant and asserted under oath that probable cause existed to arrest Mr. Schur for felony trespassing and harassment due to the July 27, 2024 incident.

90.     A judge signed the warrant request on September 3, 2024.

91.     Later that day, Defendant Morales went to Mr. Schur's apartment at 201 Clement St. and arrested Mr. Schur.

92.     With his children at his apartment and under his care, Defendant Morales arrested Mr. Schur for harassment and trespassing – the third time in less than two years. They handcuffed Mr. Schur while one of his children was on the toilet and the other was in the bathtub.

93.     As a result of this arrest, Mr. Schur spent a day in jail and hired a criminal defense attorney.

94.     The harassment and domestic violence charges were dismissed soon thereafter.

***Town of Basalt Police Department training/supervision failures***

95.     At the time of all three arrests, Defendant Town of Basalt employed a total of ten police officers.

96.     Five of the ten police officers, including Defendant Lieutenant Munch, were involved with the arrest on December 30, 2022.

14

97.     All of the officers involved in the first two arrests, including Defendant Munch, misperceived Mr. Schur's lawful, disability-related conduct as harassment.

98.     Defendant Munch knew about Mr. Schur's disability and arrested him without probable cause because of the disability. In doing so, Defendant Town of Basalt violated Mr. Schur's rights under the ADA.

99.     Defendant Munch stated multiple times that the ADA does not apply to criminal cases, which strongly suggests that Defendant Town of Basalt does not or had not up to that point trained its officers on ADA compliance – including to avoid misperceiving disability-related conduct as criminal conduct. Without such training, a violation of federal rights was inevitable, repeatedly occurred without correction, and remains likely to happen again.

100.    Additionally, on March 28, 2022, the Colorado Supreme Court decided *People v. Moreno*, 506 P.3d 849, 855-57 (Colo. 2022). In *Moreno*, the court analyzed subsection 1(e) of Colorado's harassment statute, C.R.S. § 18-9-111, and held that the statute's restriction on communications made in a manner "intended to harass" was facially overbroad because it "encompasses a substantial amount of protected speech." *Moreno*, 506 P.3d at 855-56.

101.    The court invalidated the phrase "intended to harass," thereby limiting subsection 1(e) to communications made "in a manner intended to … threaten bodily injury or property damage … or that [are] obscene." *Moreno*, 506 P.3d at 856 n.5.

102.    *Moreno*'s ruling applies to all arrests involving C.R.S. § 18-9-111(1)(e) after March 28, 2022.

103.    Despite *Moreno*'s constitutional limitation on the harassment statute, Defendant Town of Basalt provided no training whatsoever to its officers on this issue.

15

104.    Instead, the Town permitted and continues to permit its officers, including Defendant Lieutenant Munch, to make arrests under the invalidated provision of the statute and for reasons that are no longer supported by the law.

105.    As a result, Defendant Town of Basalt's failure to train/supervise its officers regarding the crime of harassment was a moving force behind Mr. Schur's arrests.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983, Fourth Amendment and C.R.S. § 13-21-131, Article II §7**
***Unlawful Arrest (First and Second Arrests)***
**(Defendant Munch)**

104.    Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding Paragraphs of the Complaint.

105.    On December 30, 2022, Defendant Munch arrested Mr. Schur for felony trespassing, harassment, and domestic violence.

106.    Mr. Schur was the sole owner of the house on Evans Road.

107.    Mr. Schur's name was the only name on the property title for 100 Evans Road Unit 104.

108.    The prenuptial agreement between Mr. Schur and Mrs. Schur identified the house as Mr. Schur's property.

109.    Mrs. Schur told Defendant Munch that there was no restraining order or other legal order preventing Mr. Schur from being at the home on Evans Road.

110.    Mrs. Schur also told Defendant Munch that Mr. Schur had recently voluntarily decided to stay at a nearby apartment some nights in order to give his family some relief from his OCD at home.

111.     Mr. Schur's clothes and personal belongings remained, and continue to remain, at the Evans Road home.

112.     Mr. Schur continued (and continues) to pay the bills for the Evans Road home.

113.     Mr. Schur continued (and continues) to have access to the building and a key to the home.

114.     Mrs. Schur did not pay any of the bills for the Evans Road home.

115.     Mr. Schur never agreed to move out of the home, nor did he grant Mrs. Schur a property-ownership interest in the home.

116.     Prior to arresting Mr. Schur on December 30, 2022, Defendant Munch merely relied on Mrs. Schur's statement that she did not want Mr. Schur at the home as foundation for his assertion of the felony trespassing charge.

117.     Defendant Munch made no effort to investigate whether Mr. Schur was allowed to be at the Evans Road home or whether he owned the home.

118.     Defendant Munch did not have reliably trustworthy information indicating that Mr. Schur was not allowed in the Evans Road home.

119.     Additionally, Defendant Munch arrested Mr. Schur and charged him with harassment under subsection 1(e) of C.R.S. § 18-9-111.

120.     All of Mr. Schur's statements and text messages to his wife related to issues involving childcare, planning events, and/or Mr. Schur's OCD-related preferences for cleanliness.

121.     None of Mr. Schur's statements or text messages involved any threats, nor were any of his communications made with the intent to harass Mrs. Schur.

122.     The charges relating to the December 2022 arrest were dismissed.

123.    On November 10, 2023, Defendant Munch arrested Mr. Schur for harassment and domestic violence.

124.    This time, Defendant Munch arrested Mr. Schur for harassment under subsection 1(g) of C.R.S. § 18-9-111.

125.    However, Mr. Schur's text messages were sent during the day and evening, and Defendant Munch had no information suggesting that Mr. Schur was sending messages at inconvenient hours or at a time when Mr. Schur should not have been communicating with his wife.

126.    Mrs. Schur responded to Mr. Schur's messages and made no attempt to block him from contacting her.

127.    Indeed, they were still married and had two children together, so there were numerous issues requiring communication. None of Mr. Schur's communications can be reasonably construed as threatening or criminal.

128.    The charges relating to the November 2023 arrest were dismissed the day after the arrest, when the state court judge concluded no probable cause supported the arrest.

129.    The actions described herein of Defendant Munch, while acting under color of state law, deprived Mr. Schur of the rights, privileges, liberties, and immunities secured by the Constitution of the United States and the Colorado Constitution, including the right to be free from arrests without probable cause.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983, First Amendment and C.R.S. § 13-21-131, Article II §10
### *First Amendment Retaliation (First and Second Arrest)*
### (Defendant Munch)

130.    Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding Paragraphs of the Complaint.

18

131.   None of Mr. Schur's statements or text messages to Mrs. Schur were threats.

132.   Mr. Schur did not threaten violence or any harm whatsoever against Mrs. Schur.

133.   Mr. Schur's communications facially did not violate any provision of the operative harassment statute.

134.   Defendant Munch caused Mr. Schur's arrest on December 30, 2022, due to Defendant Munch's belief that Mr. Schur's texts were offensive to him, or as he put it: "way over the top."

135.   Defendant Munch also concluded that Mr. Schur's "protocols" regarding cleanliness were subjectively harassing.

136.   Defendant Munch arrested Mr. Schur again on November 10, 2023, due to Defendant Munch's assertion that Mr. Schur was sending "too many" messages to Mrs. Schur about their family.

137.   There was no protection order or other legal restriction in place preventing Mr. Schur from communicating with Mrs. Schur.

138.   All of Mr. Schur's messages to Mrs. Schur related to their relationship, children, and home life.

139.   None of Mr. Schur's statements or messages involved obscenities.

140.   None of Mr. Schur's statements or messages were likely to result in a breach of the peace.

141.   Defendant Munch arrested Mr. Schur twice because of Mr. Schur's speech.

142.   On December 30, 2022, Defendant Munch became upset with Mr. Schur's "protocols" regarding cleanliness, despite the fact that Mrs. Schur expressly stated such "protocols" were a product of his OCD.

143.   Defendant Munch arrested Mr. Schur for his speech again on November 10, 2023.

144.     Defendant Munch knew that Mr. Schur was communicating with his wife and mother of his children about family issues, such as coordinating a parent-teacher conference, and not anything that would violate the harassment statute.

145.     Defendant Munch also knew that Mrs. Schur had not blocked Mr. Schur from communicating with her; that she continued to respond to his messages; that Mr. Schur had not sent any threatening or harassing messages; and that she explained his messages were a product of his OCD.

146.     None of Mr. Schur's speech constituted criminal conduct.

147.     Nothing Mr. Schur said could be reasonably construed as threatening.

148.     All of Mr. Schur's communications were protected by the First Amendment.

149.     Defendant Munch sought to punish Mr. Schur because Defendant Munch believed the "protocols" and complaints of uncleanliness made Mr. Schur a "bad husband."

150.     As a result of these arrests, Mr. Schur suffered emotional, economic, dignitary, and reputational injuries. Mr. Schur fears that Defendant Munch will continue to retaliate/punish him for his protected speech in the future.

151.     The actions described herein of Defendant Munch, while acting under color of state law, deprived Mr. Schur of the rights, privileges, liberties, and immunities secured by the Constitution of the United States and the Colorado Constitution, including the right to freedom of speech.

### THIRD CLAIM FOR RELIEF
#### 42 U.S.C. § 12131 et seq.
***Discrimination Pursuant to the Americans with Disabilities Act* ("ADA")**
**(Defendant Town of Basalt)**

152.     Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding Paragraphs of the Complaint.

20

153.     Mr. Schur is a disabled person within the meaning of the Americans with Disabilities Act. He has been diagnosed with OCD.

154.     Mrs. Schur repeatedly told Defendant Munch about Mr. Schur's OCD during their conversations before Mr. Schur's arrests on December 30, 2022, and again on November 10, 2023.

155.     When Mr. Schur told Defendant Munch that his disability should be considered under the ADA, Defendant Munch responded by saying the ADA does not apply to criminal cases.

156.     Half of the Basalt Police Department was involved with Mr. Schur's first arrest, but none of the officers, including Defendant Munch, even mentioned the ADA when discussing Mr. Schur's disability or the arrests despite being advised of Mr. Schur's OCD.

157.     Defendant Munch and his fellow officers did not receive adequate training to recognize that Mr. Schur's communications to his wife about "protocols" and cleanliness were products of his diagnosed disability and did not constitute criminal conduct.

158.     Ultimately, Defendant Munch misinterpreted Mr. Schur's disability-related conduct as illegal conduct.

159.     Because of Mr. Schur's disability, and behavior relating to that disability, he was unlawfully arrested twice by Defendant Munch.

160.     Defendant Munch erroneously and unreasonably concluded that Mr. Schur's communications to his wife, which Defendant Munch knew were a non-threatening and resulted from his OCD, were "the reason DV laws are in place."

161.     Defendant Munch also irrationally disregarded evidence that Mrs. Schur assaulted or otherwise engaged in domestic violence when she struck Mr. Schur in the shoulder, and instead focused on Mr. Schur's non-violent and non-criminal conduct in assessing and asserting that Mr. Schur committed domestic violence, rather than arresting Mrs. Schur.

162.    But for Mr. Schur's disability, Defendant Munch would not have arrested him or treated him differently than Mrs. Schur.

163.    Defendant Town of Basalt, as a public entity, caused and/or contributed to Mr. Schur's arrests, prosecution, and disparate treatment by failing to train and supervise its officers to recognize disability-related conduct like that identified herein could not reasonably form the basis for arrest or criminal charges. The Town permitted its officers to misperceive Mr. Schur's lawful, disability-related conduct as criminal conduct and as a reason to discriminate against him, despite the fact that the Town had notice through the dismissal of charges that he should never have been charged in the first place.

### FOURTH CLAIM FOR RELIEF
**42 U.S.C. § 1983, Fourth Amendment and C.R.S. § 13-21-131, Article II §7**
***Unlawful Arrest (Third Arrest)***
**(Defendants Morales and Santiago)**

164.    Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding Paragraphs of the Complaint.

165.    On July 27, 2024, Defendant Morales responded to Mr. Schur's home at Evans Road regarding a complaint of trespassing by Mrs. Schur.

166.    Although Mr. Schur had been staying at a nearby apartment, the home was exclusively in his name.

167.    There was no protection order preventing Mr. Schur from being at his home.

168.    Defendant Morales entered Mr. Schur's home and confirmed that he was the only person in the home.

169.    Mrs. Schur was in New Hampshire while Mr. Schur was at his home.

170.    Mrs. Schur reported to Defendant Morales that Mr. Schur had sent her text messages asking about his iPad, stating that he had a right to be there, asking if anything was broken, and telling her that he would take the dog out for a walk.

171.    Mr. Schur told Defendant Morales that he spoke to Defendant Munch a few days prior about his intent to go to his home. Mr. Schur explained to Defendant Morales that Defendant Munch told him that, based on the information he had and the absence of a protection order, Mr. Schur would not be trespassing if he went to the Evans Road home.

172.    None of Mr. Schur's messages included any communications that could be reasonably construed as taunts, insults, or any communication likely to provoke a violent or disorderly response under the fighting words doctrine. Indeed, Mr. Schur was only trying to help his family by keeping the home safe, clean, and prevent it from falling into disrepair.

173.    Defendant Morales called Defendant Munch to inquire about the conversation he had with Mr. Schur. Defendant Munch confirmed with Defendant Morales that he told Mr. Schur that, without a protection order restraining Mr. Schur from the property, Mr. Schur would not be trespassing in his own home.

174.    When Defendant Morales discussed the incident with Defendant Munch, both officers agreed that the private agreement between Mr. Schur and Mrs. Schur was solely a civil matter and that any purported violations of the agreement could not be criminally enforced.

175.    Defendant Morales called Defendant Santiago to discuss the incident and told him what she had learned and discussed with the other officer. Defendant Santiago advised Defendant Morales to seek a warrant for trespassing.

176.    On September 3, 2024, Defendant Morales submitted an affidavit requesting a warrant for harassment, felony trespassing, and domestic violence.

177.    Although Defendant Morales reviewed the text messages between Mr. Schur and Mrs. Schur, she did not see any communications that could reasonably be construed as threatening/harassing.

178.    A judge approved the warrant request based on Defendant Morales' assertion under oath that probable cause existed to arrest Mr. Schur for harassment, felony trespassing, and domestic violence.

179.    In the evening of September 3, 2024, Defendant Morales arrested Mr. Schur pursuant to the warrant at his apartment while his children were present.

180.    Mr. Schur spent the night and next day in jail before being released.

181.    The harassment and domestic violence charges were dismissed soon thereafter, and the felony charge is still currently pending at the time of this filing.

182.    The actions described herein of Defendants Morales and Santiago, while acting under color of state law, deprived Mr. Schur of the rights, privileges, liberties, and immunities secured by the Constitution of the United States and the Colorado Constitution, including the right to be free from arrests without probable cause.

### FIFTH CLAIM FOR RELIEF
**42 U.S.C. § 1983, First Amendment and C.R.S. § 13-21-131, Article II §10**
***First Amendment Retaliation (Third Arrest)***
**(Defendant Morales)**

183.    Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding Paragraphs of the Complaint.

184.    Defendant Morales reviewed the text messages between Mr. Schur and Mrs. Schur and observed that none of the messages were threatening or likely to provoke a violent response.

185.    Instead, the text messages related to issues about the house (e.g., maintenance, his right to be there, etc.) and their children.

186.    Defendant Morales also knew that Mrs. Schur had not blocked Mr. Schur from communicating with her, and that she continued to respond to his messages.

187.    None of Mr. Schur's speech constituted criminal conduct.

188.    All of Mr. Schur's communications were protected by the First Amendment.

189.    Defendants Morales sought to punish Mr. Schur because Mrs. Schur told Morales that Mr. Schur was harassing her, without providing any evidence whatsoever of criminal conduct under the harassment statute.

190.    As a result of this arrest, Mr. Schur suffered emotional, economic, dignitary, and reputational injuries. Mr. Schur fears that Defendant Morales, along with the other officers in the Basalt Police Department, will continue to retaliate/punish him for his protected speech in the future.

191.    The actions described herein of Defendant Morales, while acting under color of state law, deprived Mr. Schur of the rights, privileges, liberties, and immunities secured by the Constitution of the United States and the Colorado Constitution, including the right to freedom of speech.

### SIXTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983, *Monell*
### *Failure to Train/Supervise*
### (Defendant Town of Basalt)

192.    Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding Paragraphs of the Complaint.

193.    On March 28, 2022, the Colorado Supreme Court decided *People v. Moreno*, 506 P.3d 849, 855-57 (Colo. 2022).

194.     In *Moreno*, the court analyzed subsection 1(e) of Colorado's harassment statute, C.R.S. § 18-9-111, and held that the statute's restriction on communications made in a manner "intended to harass" was facially overbroad because it "encompasses a substantial amount of protected speech." *Moreno*, 506 P.3d at 855-56.

195.     The court invalidated the phrase "intended to harass," thereby limiting subsection 1(e) to communications made "in a manner intended to … threaten bodily injury or property damage … or that [are] obscene." *Moreno*, 506 P.3d at 856 n.5.

196.     *Moreno*'s ruling applies to all arrests involving C.R.S. § 18-9-111(1)(e) after March 28, 2022.

197.     Defendant Munch arrested Mr. Schur under C.R.S. § 18-9-111(1)(e) on December 30, 2022.

198.     At the time of the arrest, Defendant Munch was a lieutenant with supervisory responsibilities over other officers in the Basalt Police Department.

199.     During the incident on December 30, 2022, Defendant Munch told Mrs. Schur that there were only ten police officers with the Basalt Police Department.

200.     During that incident, there were two additional Basalt Police Officers on scene with Defendant Munch and two other Basalt Police Officers detaining Mr. Schur. Thus, five of the ten Basalt Police Officers were involved with Mr. Schur's arrest for harassment on December 30, 2022.

201.     When Defendant Munch arrested Mr. Schur, he had no information suggesting that Mr. Schur made communications in a manner intended to threaten bodily injury or property damage or that were obscene.

202.     Defendant Munch wrongfully arrested Mr. Schur under the provision invalidated in *Moreno* because Defendant Town of Basalt did not train its officers on the limitations of C.R.S. § 18-

9-111(1)(e) announced in *Moreno*. In other words, Defendant Town of Basalt permitted its officers to continue making arrests for communications made "in a manner intended to harass," including the arrest of Mr. Schur, despite its unconstitutionality and previous invalidation.

203.    The officers involved with Mr. Schur's arrest should have known that his speech was protected by the First Amendment and could not reasonably be considered harassment.

204.    The officers, including Defendants Munch and Morales, should have reasonably known that constitutionally-protected activity cannot form the basis for an arrest.

205.    Any reasonably well-trained police officer would have known that Mr. Schur's non-threatening communications to his wife could not and did not establish probable cause for harassment.

206.    The fact that half of the Basalt Police Department participated in Mr. Schur's arrest, without objecting to the basis for the harassment charge, shows that Defendant Town of Basalt has failed to train and supervise its officers and supervisors on First Amendment principles and appropriate limitations regarding probable cause for harassment.

207.    But for Defendant Town of Basalt's failure to train and/or supervise its officers, Mr. Schur would not have been arrested and charged with harassment.

208.    Additionally, Defendant Town of Basalt failed to provide any training whatsoever to its officers regarding the ADA.

209.    Defendant Munch stated multiple times during the arrests of Mr. Schur that the ADA does not apply to criminal cases. Had he received any training on this issue, he would have known that the ADA applies to arrests.

210.    Proper training would have ensured that Defendant Munch did not misperceive Mr. Schur's lawful, disability-related conduct as criminal conduct. In other words, ADA training would have educated Defendant Munch to the fact that having severe OCD or communicating in a manner

symptomatic of OCD is not against the law, and unless there is criminal conduct beyond the conduct he personally found offensive, Mr. Schur's loquacious communications could not establish probable cause.

211.    These failures by Defendant Town of Basalt, which involved half the police department in a single incident, deprived Mr. Schur of the rights, privileges, liberties, and immunities secured by the Constitution of the United States and the ADA.

**SEVENTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983, *Monell***
***Unconstitutional Pattern and Practice***
**(Defendant Town of Basalt)**

212.    Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding Paragraphs of the Complaint.

213.    Defendant Town of Basalt, through its police department, wrongfully arrested Mr. Schur three times in less than two years.

214.    On December 30, 2022, Defendant Munch arrested Mr. Schur for harassment under C.R.S. § 18-9-111(1)(e), criminal trespass, and domestic violence.

215.    On November 10, 2023, Defendant Munch arrested Mr. Schur for harassment under C.R.S. § 18-9-111(1)(g) and domestic violence.

216.    On September 3, 2024, Defendants Morales and Santiago arrested Mr. Schur for harassment under C.R.S. § 18-9-111(1)(h), felony trespass, and domestic violence.

217.    None of the officers had probable cause to arrest Mr. Schur for any crime.

218.    The repeated wrongful arrests, for essentially the same conduct during a narrow timeframe, demonstrates that Defendant Town of Basalt has a pattern and practice of arresting Mr. Schur without probable cause.

219.     Although the arrests involved different subsections of the harassment statute, all of the arrests related to the same conduct: Mr. Schur's constitutionally-protected and disability-related speech, and Mr. Schur's desire to enter his own home.

220.     The unconstitutional pattern and practice is likely a result of the Town's failure to train its officers on *Moreno*, the elements of trespassing, the ADA, and the requirement that an officer establish probable cause before invoking the power of arrest.

221.     Defendant Town of Basalt clearly permits its officers to make arrests based on whims and feelings, rather than requiring its officers to establish probable cause for each element of the crime before making an arrest or seeking an arrest warrant.

222.     Due to this unconstitutional practice, Defendant Town of Basalt was a moving force behind Mr. Schur's three arrests.

223.     These failures by Defendant Town of Basalt, which involved almost the entire police department through the three arrests (and half the police department in a single incident), deprived Mr. Schur of the rights, privileges, liberties, and immunities secured by the ADA and the First and Fourth Amendments to the Constitution of the United States.

## EIGHTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### *Request for Declaratory and Injunctive Relief*
### (Defendant Town of Basalt)

224.     Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding Paragraphs of the Complaint.

225.     Plaintiff seeks declaratory relief regarding the limitation imposed on the harassment statute in *People v. Moreno*. Specifically, Plaintiff seeks an order from the Court stating that arrests under

29

C.R.S. § 18-9-111(1)(e) require a threat of bodily injury or property damage, and that arrests made for conduct "intended to harass" are unconstitutional under the First Amendment.

226.    Additionally, Plaintiff seeks injunctive relief regarding the repeated wrongful arrests of Mr. Schur. Specifically, Mr. Schur requests an order from the Court restraining Defendant Town of Basalt from arresting him for harassment or trespassing under circumstances similar to the three arrests described herein. In other words, Plaintiff requests an injunction be entered against the Town of Basalt requiring it to train its officers on the limitations announced in *Moreno* and prohibiting it from arresting Mr. Schur for lawfully entering his own home and exchanging non-threatening communications with Mrs. Schur.

227.    Without an injunction, there is a substantial likelihood that Defendant Town of Basalt will continue to arrest Mr. Schur for his constitutionally-protected speech and entering his own home. In other words, Mr. Schur has been realistically threatened by a repetition of his experience. There is also a substantial likelihood that without an appropriate order that officers from the Town of Basalt will continue making unconstitutional and unlawful arrests based upon their inadequate training and clear misunderstanding of the law.

**WHEREFORE,** Plaintiff respectfully prays that this Court enter judgment in his favor and against all Defendants for declaratory relief, injunctive relief, compensatory damages, punitive damages against the individual defendants, interest as allowed by law, costs, expert witness fees, attorney's fees, and for any other and further relief that this Court deems just and proper.

## PLAINTIFF REQUESTS A JURY TRIAL ON ALL ISSUES SO TRIABLE

Respectfully submitted this 25th day of November, 2024.

**s/Zachary L. Shiffler**
Zachary L. Shiffler
Raymond K. Bryant
Civil Rights Litigation Group
1543 Champa Street, Suite 400
Denver, CO 80202
Phone: 720-515-6165
Fax: 720-465-1975
zach@rightslitigation.com
raymond@rightslitigation.com
*Attorneys for Plaintiff*